DAWKINS, J.
Plaintiff brought two suits attacking the correctness of the assessments of its corporate franchise for the years 1919 and 1920, respectively. No question was raised as to the valuation of its physical property, and the taxes thereon were paid. The Board of State Affairs (now the Louisiana Tax Commission) the police jury, and the tax collector were made defendants, and writs of injunction were issued, restraining collection of any taxes upon the franchise until a determination of these suits. The city of Lake Charles uses for purposes of taxation same valuations as those of the state and parish, ánd it was by supplemental petition made party defendant, and enjoined in the same manner from collecting taxes upon the franchise assessment.
Plaintiff made no return of its franchise for the year 1919, but for 1920 placed a value thereon in its assessment list of $23,975. The State Board of Affairs assessed it for the first year at $484,930, and for the second year raised plaintiff’s valuation to $460,140.
The court below reduced the valuation for 1919 to $176,986 and for 1920 to the sum of $187,009; defendants appealed, and plaintiff has answered, praying that the assessments be further reduced to the sum of $23,975 for each year.
Opinion.
It is not the function of courts to as-N sess property. That duty is imposed upon / other state agencies, and their conclusions V are presumed to be correct until the party / complaining has shown a clear case of error. C., B. & Ry. Co. v. Babcock, Treasurer, 204 U. S. 585, 27 Sup. Ct. 326, 51 L. Ed. 636; Adams Express Co. v. Ohio State Auditor, 165 U. S. 229, 17 Sup. Ct. 305, 41 L. Ed. 683; Sunday Lake Iron Co. v. Township of Wakefield, 247 U. S. 352, 38 Sup. Ct. 495, 62 L.Ed. 1154.
The pleadings in these consolidated cases do not clearly define the issues; but, after a careful examination of the voluminous records and briefs, we conclude that the following are the grounds of complaint against the assessments; to wit:
(1) That there was not deducted from gross earnings a charge for depreciation arising through wear and tear of the property, obsolescence, and other causes, rendering necessary replacement at soma future date.
(2) That a reasonable rate of return should be allowed upon the invested value of the physical property, instead of the assessed value.
(3) The same or a greater rate of return should be used in capitalizing earnings, after deducting income of tangible property, in arriving at the value of the franchise.
(4) When assessments are reduced at all, costs should be paid by the defendants.
(5) That only one valuation should be used, and the board was not justified in adding an arbitrary sum as a “primary” value.
The Year 1919.
For the year 1919, the Board of State Affairs, hereinafter referred to as the Board, *481 arrived at a valuation of the franchise in the following manner, viz.:
It found:
Tie average gross earnings for the preceding five years to be....................$244,421 00
From this ivas deducted the following:
Average earnings of ice plant (same period) which required no franchise...................$ 16,789 00
Average taxes................... 11,234 00
Average operating expenses.... 159,702 00 187,725 00
Leaving net earnings of........ $ 56,696 00
From the assessed value of physical property, amounting to........................$414,540 00
Was subtracted the value of ice plant..... 47,000 00
Giving .................................... $387,540 00
■ — upon -which was allowed an interest return of 8 per cent., oj- $29,400, which was deducted from the net earnings above, $56,-696, and left $27,296. This last sum, being capitalized at 6 per cent., was found to produce $454,980, to which was added $30,-000 as the “primary” value of the franchise, giving it a valuation for assessment purposes of $484,930.
Plaintiff contends as above stated, that it should be allowed a reasonable return, say 8 per cent, on the invested value of its propr erty; but we cannot see why this should be so, since the amount of taxes which it has to pay upon its physical property is figured upon the assessed value. On the other hand, it is insisted that plaintiff should be allowed out of the revenues of each year, before calculating the value of the franchise, such sums as will cover both maintenance and depreciation; that is, for keeping the property in good operating condition, and to cover functional depreciation, obsolescence, etc., which would require replacement at the end of its ordinary life or the substitution of improvements due to invention or other causes rendering its machinery obsolete. Therefore, if the property, in the beginning, were assessed on the basis of cash value, as is now required, and such allowances were made from year to year, there would never be any increase in the investment (except in the case of enlargement, which would correspondingly raise the assessment), since the allowances for maintenance and depreciation from earnings would presumably be returned to the property. However, if the property should enhance in value, then it is to be assumed that the assessment would be proportionately increased, andi hence the capital upon which a return should be had would be correspondingly enlarged. If the actual value depreciated, notwithstanding the application from earnings of reasonable sums for maintenance and depreciation, as above suggested, it would undoubtedly be due to the lessened earning power of the property, in which event there would be no excess net income to be capitalized as the value of the franchise, for we cannot conceive that a plant that was producing net revenue equal to or in excess of a fair return upon the value of its property, as represented by the original investment, could be said to be worth less than that sum.
It is true that the franchise was not assessed until 1919, and the valuation placed upon the tangible property is less than that claimed by the plaintiff as the amount invested ; but it is also true this additional investment does not appear from the record to have been made from sources other than earnings, and that for all the years preceding no taxes were paid upon the franchise, and the revenues in.excess of a fair return went either into the property or into the pocket of the stockholders as dividends. As suggested, it is not made clear that this additional investment did not arise from earnings, and we are justified, in these circumstances, in taking the' situation as we now find it, treating the value as assessed as the capital for allowing a reasonable income.
It must be remembered that plaintiff enjoys a monopoly of the business in which it is engaged, by virtue of its franchise, ahd *483 this is mainly responsible for the fact that it is able to earn more than a .reasonable return upon its property, and hence gives additional value above what it would bring if offered for sale without that exclusive right.This intangible asset was the thing the authorities were endeavoring to reach in assessing plaintiff’s franchise.
We have been unable to find in the record the reports which were made to the Board, and upon which the assessment of 1919 was based, and hence will consider the “statement of average net earnings for five years, ending January 1, 1919,” with accompanying exhibits filed in evidence proved by the evidence and marked “P-11.”
The gross income or earnings (exclusive of the ice plant) for the five years preceding 1919 were as follows:
1914 .............................. $176,645 16
1915 ...........................:.. 175,939 02
1916 .............................. 170,261 03
1917 .............................. 193,057 56
1918 .............................. 231,402 42
5)947,304 19
Average $189,461 03
Operating expenses for the same period:
1914 .............................. $144,221 12
1915 ...............1.............. 146,105 70
1916 .............'................. 139,507 02
1917 .............................. 198,353 76
1918 .............................. 251,898 20
5)880,083 80-
Average ......................... $176,016 76
Included in these sums of “operating expenses,” ive find four items of “depreciation,” “interest,” “maintenance,” and “miscellaneous” charges as follows:
Depreciation.
1914 ........................... 31,529 41
1915 .............................. 31,369 91
1916 .............................. 10,145 74
1917 .............................. 19,871 48
1918 .............................. 36,657 73
5)129,574 27
Average $ 25,914 85
Average (Cant'd) $ 25,914 85
Interest.
1914 .............................. 12,095 54
1915 .............................. 12,235 47
1916 .............................. 12,617 06
1917 .............................. 21,492 24
1918 .............................. 28,236 65
5)86,676 96
Average $ 17,335 39
Maintenance.
1914 .............................. (not shown)
1915 .............................. 13,074 20
1916 .............................. 14,319 74
1917 .............................. 16,008 23
1918 .............................. 32,573 89
4)75,976 06
Average $ 18,994 01
Miscellaneous.
1914 .............................. 1,516 88
1915 .............................. 782 85
1916 ..........:................... 1,048 43
1917 .............................. 25.633 25
1918 .............................. 17,942 53
5)46,923 94
Average $ 9,384 78
Total 71,299 03
This depreciation charge of $25,914.85, therefore, figuring the physical property, including both that which actually depreciates and otherwise, at an average of the assessed value for 1919, less the ice plant, $367,540.00, amounts to an average for the five years of a little more than 7 per cent.; whereas that claimed in the briefs and allowed by the lower court is 4 per cent. Hence this item should be reduced to $14,701.60. Public Utilities (Pons) § 467, p. 534 et seq.
 There is no segregation of the interest or showing upon what account it was paid; if upon money invested in the property enjoying the franchise as capital, the plaintiff was entitled to a fair return thereon the same as upon the original capital, but not so if money was borrowed and devoted to other purposes. The record discloses quite a lot of money loaned by the plaintiff and used in ways not for the direct benefit of the plant, *485 and, in these circumstances we assume that the cash valuation placed upon the tangible property includes such improvements over the original investment as may have been made with borrowed funds.
The item of $18,994.01, covering average maintenance for five years, amounts to .0517 per cent, of the assessed value of the physical property, and it would seem is ample.
The “miscellaneous” charge averaging $9,-344.78 is likewise not satisfactorily explained, although it is said, in a general way, to cover matters' -too small to particularize, storm damage, etc. Besides the expert sworn by defendant (page 190 of the transcript) says that such items are taken care of in the charge for general depreciation.
Therefore deductions should be made from average “operating expenses” as follows:
Average operating expenses as shown by Exhibit P-11...............................$176,016 76
Less:
Difference in depreciation ................ $25,914 85
14,701 60 $11,213 25
Interest .......................... 17,335 39
Miscellaneous ................... 9,384 78 37,933 42
Leaving average gross operating expenses including taxes $138,083 34
 Subtracting this from average gross income leaves net earnings amounting to $51,377.69. Allowing a return of 8 per cent, upon tangible property valued at $367,540, as was done by the Board, the net earnings of $51,377.69 are reduced by $29,304.20, leaving $22,073.49 to be capitalized as the value of the franchise. This should be done on the same basis as tangible property; that is 8 per cent., and which produces a valuation of $275,918 for 1919. Baton Rouge Electric Co. v. Board, 149 La. 383, 89 South. 244. The “primary” franchise should not be added. See same authority.
It seems to be a rule, fairly well established, that a utility of the character of plaintiff should be permitted to deduct from its gross earnings both a reasonable charge for maintenance or repairs to keep the property in proper running condition and a depreciation charge to cover functional depreciation, obsolescence, etc., necessary to meet the cost of replacing property which wears out or which may have to be discarded because of inadequacy or becoming obsolete, as well as any other cause which may require its replacing. And we think ample allowance is made for these matters in the items of “depreciation” and “maintenance” recognized above.
1920.
For the year 1920, the Board valued the franchise on the following basis, to wit:
There was placed upon the physical property a valuation of $424,110. -
From this was deducted a 10 per cent, depreciation upon the street railway, boiler plant, electric plant, water plant, and ice plant, valued at $380,000, or $38,000, leaving a balance, according to the Board’s figures, of $396,110 (but should have been $386,110, due to an error in subtraction). It then subtracted the value of the ice plant, $47,000, less 10 per cent, depreciation, $42,300, leaving a net value for assessment of the physical property of $353,810.
It found the gross earnings for the five years preceding 1920 to be:
1915 ............................$ 229,986 00
1916 ............................ 205,652 00
1917 ............................ 245,100 00
1918 .....;..............;....... 307,756 00
1919 ............................ 342,526 00
5)1,331,020 00
Average ..................... $266,204 00
From which was deducted average gross earnings
of the ice plant.............. 17,120 00
Leaving gross earnings without ice plant................. $249,084 00
Further deductions were then made, as follows:
Average taxes...................$ 13,463 00
Average operating expense____ 177,118 00 $190,581. 00
Balance representing net earnings........ $ 58,503 00
*487 Out of this was allowed a return of 8 per cent, upon the assessed value of the physical property, $858,810, amounting to $28,305, and leaving $30,198, which, capitalized at 7 per cent., was found to yield $430,140. The same “primary” value of $30,000 was added, and the assessed valuation of the franchise for 1920 was fixed at $460,140.
There is considerable difference, both as to average gross income and average operating expenses, between the assessment by the Board and the figures submitted on the trial and covered by Exhibit P-11, as appears from this: N
Board’s Exhibit Figures P-11
Average gross earnings........$266,204 00 $207,101 40
Average operating expenses.... 190,581 00 198,546 44
$ 75,623 00 $ 8,534 96
Less average earnings ice plant .......................... 17,120 00
Average net earnings..........$ 58,503 00 $ 8,554 96
No serious effort was made to explain this difference, except to point out two clerical errors in the Board’s figures, which were in plaintiff’s favor; and it appears that the Board’s statement upon which the assessment was made, was prepared -from reports furnished by the plaintiff. The record shows that plaintiff had copies of those reports (upon which the Board acted), and, although requested to do so, never produced them in court, or otherwise cleared the discrepancies up. It has not therefore discharged the burden resting upon it to make out its case sufficiently to justify us in disturbing the Board’s action.
We do not think the Board was justified in deducting a flat 10 per cent, depreciation from the assessed valuation of the tangible property, and hence we will fix it at the sum which was found without this deduction to wit, $377,110, and for the reasons given in the case of 1919 assessment will omit the “primary” franchise value of $30,-000. We take it that, in its reports to the Board, plaintiff included in its “operating expenses” similar items of “depreciation” and “maintenance” to those found in P-11 and accompanying documents for the assessment of 1919, and that it has therefore been given the full benefit of these charges.
Therefore, figuring the value of the physical or tangible property at $377,110, plaintiff should be allowed 8 per cent, thereon, or $30,1G8.S0, which, deducted from the net earnings found by the Board, leaves $28,334.-20 to be. capitalized at 8 per cent., and produces the sum of $354,177.50, as the valuation to be placed upon the franchise for assessment purposes for 1920.
As pointed out earlier in this opinion, one who attacks the work of a body like the Board of State Affairs, which is charged by law with the duty of fixing valuations upon property for the purposes of assessment, must establish his claim for relief by clear and convincing proof, otherwise the action of. the assessing authority will be sustained under the strong presumption which exists in favor of its correctness.
For the reasons assigned, the judgment appealed from is amended by increasing the assessment value of plaintiff’s franchise for 1919 to the sum of $274,187 and for the year 1920 to the sum of $354,177.50; that the plaintiff pay the costs of this appeal, and those of the lower court to be paid out of the taxes collected under this judgment.
As thus amended, the judgment of the lower court is affirmed.